IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE PINE CREEK VALLEY WATERSHED ASSOC., RAYMOND PROFFITT FOUNDATION, THE DELAWARE RIVERKEEPER NETWORK, and THE DELAWARE RIVERKEEPER C/O JOHN WILMER, ESQ., | : : : : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 14-1478 |
| v. | : : | |
| THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, GINA MCCARTHY, Administrator, and SHAWN GAVIN, Region III Administrator, | : : : : : : | |
| Defendants. | : | |

**<u>MEMORANDUM OPINION</u>**

Smith, J.                                                         March 17, 2015

On July 2, 2013, Pennsylvania passed Act 41,[1] a legislative enactment that amended the

Pennsylvania Sewage Facilities Act ("Sewage Facilities Act"), 35 Pa. C.S. §§ 750.1-750.20a.

Act 41 allows the use of certain on-lot sewage systems to satisfy the state's antidegradation

requirements if the design and approval of those systems comport with the Sewage Facilities

Act.  Due to their view that Act 41 works an end-run around antidegradation review, and

therefore changes existing water quality standards, the plaintiffs seek to compel the

Environmental Protection Agency ("EPA") to, at a minimum, review Act 41 for compliance with

the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1388.  But because the citizen-suit provision

under the CWA grants district courts subject-matter jurisdiction to order the EPA to perform

---

[1] 2013 Pa. Legis. Serv. Act 2013-41.  Because the parties have referred to this enactment as "Act 41" throughout the briefing, the court adopts this naming for ease of reference.

only non-discretionary acts or duties, the plaintiffs can invoke the power of this court only if the EPA has a mandatory duty to review Act 41 under the CWA.  This case, then, turns on whether such a duty can be found within the bounds of the CWA.

Ultimately, this jurisdictionally-dispositive inquiry presents a relatively straightforward *Chevron* problem that rises and falls on implementing congressional intent.  Relevant here, the court focuses on congressional intent as embodied in the statutory provision detailing the EPA's duty to review revised or new water quality standards.  For if the text of the CWA is clear that Act 41 constitutes a revised or new water quality standard, the court has jurisdiction to order the EPA to act.  If the converse is clear, jurisdiction is lacking.  If, however, the statutory provision is ambiguous, the characterization of Act 41 must be answered by the EPA, as the administering agency, to the extent that it reasonably brings its authority to bear on that precise issue.

In the end, the statutory text does not clearly address the precise question presented and so the court defers to relevant EPA regulations as permissible constructions of the CWA.  Because the regulations unambiguously preclude the conclusion that Act 41 constitutes a water quality standard, they likewise foreclose the result that Act 41 constitutes a revised or new water quality standard capable of triggering the jurisdictionally-required mandatory duty to act.  The court, therefore, lacks jurisdiction over the CWA claim and dismisses it without prejudice.  The court also dismisses the ancillary claim under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, on the merits.

## I.      PROCEDURAL HISTORY

On March 12, 2014, the plaintiffs, the Pine Creek Valley Watershed Association, the Raymond Proffitt Foundation, the Delaware Riverkeeper Network, and the Delaware Riverkeeper, filed a complaint against the defendants, the United States Environmental

Protection Agency, Gina McCarthy as the Administrator of the EPA, and Shawn Gavin as the Regional Administrator of EPA Region III.  Compl., Doc. No. 1.  In the complaint, the plaintiffs seek an order compelling the EPA to review, and ultimately to reject, Act 41 as a revised or new water quality standard that runs afoul of the CWA.  *Id.* at ¶¶ 2, 57, 60.  The plaintiffs further seek an order compelling the EPA to "promptly prepare and publish regulations denying Pennsylvania's disputed revised water quality standards."  *Id.* at ¶ 62.  To pursue these remedies, the plaintiffs invoke two rights of action: the citizen-suit provision of the CWA, 33 U.S.C. § 1365(a)(2), and the right of action created by the APA, 5 U.S.C. §§ 702, 704.  *Id.* at ¶ 1.

Taking issue with the CWA claim on jurisdictional grounds and the APA claim on merits grounds, the defendants filed a motion to dismiss on July 14, 2014.  Mot. to Dismiss, Doc. No. 16.  The plaintiffs filed a timely opposition to the motion.  Pls.' Resp. to Defs.' Mot. to Dismiss, Doc. No. 19.  The defendants filed a reply in support of the motion on August 21, 2014.  Reply in Supp. of Mot. to Dismiss Pls.' Compl., Doc. No. 24.

The court held an initial pretrial conference on September 2, 2014.  At the conference, the parties confirmed that the facts were not in dispute and that the case presented uniquely legal issues.  Order, Doc. No. 28.  Accordingly, the court gave the parties an opportunity to create a record through stipulated facts.  *Id.*  Further, the court allowed the parties to supplement their respective positions concerning the motion to dismiss and invited them to file cross-motions for summary judgment.  *Id.*  The parties eventually filed supplementary briefing with respect to the motion to dismiss, cross-motions for summary judgment, and respective responses to the cross-motions.  *See* Doc. Nos. 32-34, 36, 38, 39-41.

A slight procedural twist developed relatively early on in the litigation.  About the time that the defendants filed the motion to dismiss, the National Association of Homebuilders filed a

motion to intervene pursuant to Federal Rule of Civil Procedure 24.   The Nat'l Ass'n of Homebuilders' Mot. to Intervene Pursuant to Fed. R. Civ. P. 24, Doc. No. 17.   Approximately one month later, the Pennsylvania Builders Association filed a motion to intervene that expressed a desire to unite with the position taken by the National Association of Homebuilders, including adopting the arguments contained in its prior motion to intervene.[2]   The Pennsylvania Builders Ass'n's Mot. to Intervene Pursuant to Fed. R. Civ. P. 24, Doc. No. 23.   The plaintiffs filed oppositions to both motions to intervene.   *See* Doc. Nos. 20, 25.   The court granted both motions after the initial pretrial conference.   Order, Doc. No. 28.   In turn, the Intervenors filed an answer to the complaint, a motion for summary judgment, and a response in opposition to the plaintiffs' motion for summary judgment.   *See* Doc. Nos. 31, 35, 37.

With all relevant submissions filed by the original parties and intervenors alike, the court held oral argument on November 12, 2014.   The outstanding motions are thus ripe for disposition.

## II.   DISCUSSION

### A.   Standard of Review

Given the posture of the case, three standards of review are theoretically applicable:   (1) the standard of review under Federal Rule of Civil Procedure 12(b)(1); (2) the standard of review under Federal Rule of Civil Procedure 12(b)(6); and (3) the standard of review under Federal Rule of Civil Procedure 56.   The court recites the standards only under Rule 12, however, because they are outcome-determinative.

"A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction."   *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d

---

[2] The court refers to the National Association of Homebuilders and the Pennsylvania Builders Association collectively as "Intervenors."

Cir. 2000) (citation omitted).  "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."  *Id.* at 176 (citations and footnote omitted).  In other words, the court accepts "all well-pleaded allegations in the complaint as true and view[s] them in the light most favorable to the plaintiff."  *In re Kaiser Grp. Int'l Inc.*, 399 F.3d 558, 561 (3d Cir. 2005) (citation omitted).  In reviewing a factual attack, on the other hand, "a court may weigh and consider evidence outside the pleadings."  *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (internal quotation marks and citation omitted).  Here, the court construes the instant challenge as a facial one, noting that the parties have agreed that this matter presents solely questions of law.

A motion to dismiss under Rule 12(b)(6) tests "the sufficiency of the allegations contained in the complaint" and places the burden on the defendant to show that no claim has been presented.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted); *see Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).  In reviewing such a motion, the court accepts all well-pleaded facts in the complaint as true and construes them in a "light most favorable to the plaintiff[s]."  *Santomenno v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 290 (3d Cir. 2014) (internal quotation marks and citation omitted).  Viewing the facts in this manner, the court must ultimately determine whether the complaint "contain[s] sufficient factual matter . . . to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted).

5

With respect to the CWA claim, the court is mindful that there is significant, if not identical, overlap between the jurisdictional inquiry and any merits inquiry. *See, e.g.*, *Miccosukee Tribe of Indians of Fl. v. United States, EPA*, 105 F.3d 599, 603 (11th Cir. 1997) (noting that "the jurisdictional question is intertwined with the merits" in a similar CWA suit). In principle, this overlap is important because the Third Circuit has stated that "Rule 12(b)(1) does not provide plaintiffs the procedural safeguards of Rule 12(b)(6), such as assuming the truth of the plaintiff's allegations." *CNA v. United States*, 535 F.3d 132, 144 (3d Cir. 2008). Thus, one may read Third Circuit language to the effect that courts may address jurisdictional questions that are bound up with the merits only if they apply "a relaxed standard of proof for the jurisdictional question." *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 344 (3d Cir. 2012) (citation and footnote omitted). The court need not seriously grapple with that language in this case, however, because it is applicable only when a court is facing a *factual* challenge to subject-matter jurisdiction. *See id.* at 343-44 (discussing the relaxed standard when the jurisdictional inquiry turns on a factual dispute). When, as here, the court is presented with a facial attack, the concern over any procedural disparity between Rule 12(b)(1) and Rule 12(b)(6) vanishes as "the standard is the same when considering a facial attack under Rule 12(b)(1) or a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Petruska v. Gannon Univ.*, 462 F.3d 294, 299 n.1 (3d Cir. 2006) (citation omitted). Therefore, and despite the court agreeing with the parties that this case turns purely on questions of law, the court proceeds to the jurisdictional inquiry recognizing that the plaintiffs are procedurally protected should factual allegations somehow become relevant.

**B.      General Principles of Administrative Law**

This is a case about statutory construction and agency deference.  The doctrine set forth

in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)

therefore governs its resolution.

> *Chevron* is rooted in a background presumption of congressional intent: namely, that Congress, when it left ambiguity in a statute administered by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows. *Chevron* thus provides a stable background rule against which Congress can legislate: Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency.

*City of Arlington, Texas v. FCC*, 133 S. Ct. 1863, 1868 (2013) (internal quotation marks and

citations omitted).  This framework is often invoked, so much so that the Supreme Court

"*routinely* accord[s] dispositive effect to an agency's reasonable interpretation of ambiguous

statutory language."  *EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1603 (2014)

(emphasis added).  EPA regulations, in particular, regularly receive *Chevron* deference when

appropriate.  *See Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2439 (2014) (observing

that "[w]e review EPA's interpretations of the Clean Air Act using the standard set forth in"

*Chevron*); *PUD No. 1 of Jefferson Cnty. v. Washington Dep't of Ecology*, 511 U.S. 700, 704

(1994) (according *Chevron* deference to EPA regulation 40 C.F.R. § 121.2(a)(3) (1993));

*Chevron*, 467 U.S. 837 (deferring to an EPA regulation interpreting the Clean Air Act); *see also*

*Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (announcing that "the framework of

deference set forth in *Chevron* does apply to an agency interpretation contained in a regulation").

Chevron is expressed through a "now-canonical formulation."  *City of Arlington*, 133 S.

Ct. at 1868.  "When a court reviews an agency's construction of the statute which it administers,

it is confronted with two questions."  *Chevron*, 467 U.S. at 842.

7

First, applying the ordinary tools of statutory construction, the court must determine whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

*City of Arlington*, 133 S. Ct. at 1868 (internal quotation marks and citation omitted).

If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron*, 467 U.S. at 843 (footnotes omitted).  If the agency advances a reasonable interpretation, "a court may not substitute its own construction of a statutory provision for [the] reasonable interpretation made by the administrator of an agency." *Id.* at 844 (footnote omitted).

### C.    The CWA Claim

The citizen-suit provision of the CWA provides:

Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf--

. . .

**(2)** against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

33 U.S.C. § 1365(a)(2).  The accompanying jurisdictional grant provides: "The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, . . . to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title."  33 U.S.C. § 1365(a). As the plain text suggests, "[a] clearly mandated, nondiscretionary duty imposed on the Administrator is a prerequisite for federal jurisdiction under the CWA citizen suit provision."

*Miccosukee Tribe of Indians of Fl. v. United States, EPA*, 105 F.3d 599, 602 (11th Cir. 1997) (citations omitted).  To be sure, "Congress has waived [sovereign] immunity in § 1365(a)(2) only for suits alleging a failure of the Administrator to perform a non-discretionary duty." *Sierra Club v. Whitman*, 268 F.3d 898, 901 (9th Cir. 2001).  The vitality of this claim (indeed, the very power to hear it), then, revolves around whether the CWA imposes a mandatory duty on the EPA to review Act 41.

The plaintiffs argue that such a duty can be derived from the CWA.  They contend that "Act 41 is the equivalent of a new or revised standard that may adversely affect federally approved antidegradation standards and must be reviewed by EPA as such."  Mem. of Law in Supp. of Pls.' Resp. to Defs.' Mot. to Dismiss ("Pls.' Resp. to Mot. to Dismiss") at 3, Doc. No. 19 (internal quotation marks omitted).  Stated differently, "Pennsylvania's Act 41 is a revised or new water quality standard or is its equivalent; and as such, EPA must review and deny it because it does not meet minimum federally approved standards for antidegradation law."  Pls.' Supplemental Mem. of Law in Supp. of Pls.' Resp. to Defs.' Mot. to Dismiss Compl. in Equity at 2, Doc. No. 34.  An analysis of this argument requires review of two statutory provisions and the acceptance of one inference.

The first provision states that "[w]henever the State revises or adopts a new standard, such revised or new standard *shall* be submitted to the Administrator."  33 U.S.C. § 1313(c)(2)(A) (emphasis added).  The second provides:

> If the Administrator, within sixty days after the date of submission of the revised or new standard, determines that such standard meets the requirements of this chapter, such standard *shall* thereafter be the water quality standard for the applicable waters of that State. If the Administrator determines that any such revised or new standard is not consistent with the applicable requirements of this chapter, he *shall* not later than the ninetieth day after the date of submission of such standard notify the State and specify the changes to meet such requirements. If such changes are not adopted by the State within ninety days after the date of

notification, the Administrator *shall* promulgate such standard pursuant to paragraph (4) of this subsection.

33 U.S.C. § 1313(c)(3) (emphasis added). Taken together, these provisions confirm that "the Administrator has a mandatory duty to review any new or revised state water quality standards." *Miccosukee Tribe*, 105 F.3d at 602 (citation omitted). But implicit in the plaintiffs' argument, and the above-quoted language, is a request that the court recognize the mandatory duty as divorced from any condition precedent regarding a state's duty to submit any revised or new standard to the Administrator. *See* Pls.' Resp. to Mot. to Dismiss at 10-11 (stating that "[e]ven if a State fails to submit a new or revised standard, EPA has a mandatory duty to review any state law or policy that effects a change to state water quality standards" (footnote omitted)).

Presumably, the plaintiffs find this inference necessary because they have alleged that "Pennsylvania failed to submit this revision to its antidegradation water quality standards to the EPA Regional Administrator for review and approval within 30 days of the final state action, in violation of 33 USC 1313 (c)(2)(A) and 40 CFR 131." Compl. at ¶ 49. Because the disposition of this case does not compel the court to pass upon the validity of this inference, the court simply notes that the Eleventh Circuit has posited that "a change in state water quality standards could invoke the mandatory duty imposed on the Administrator to review new or revised standards" "[e]ven if a state fails to submit new or revised standards." *Miccosukee Tribe*, 105 F.3d at 602 (citation omitted).

### 1. *Chevron* Step One

As the defendants recognize, the dispositive issue is whether Act 41 constitutes a revised or new water quality standard. *See* Mem. of Law in Supp. of Mot. to Dismiss Pls.' Compl. at 12, Doc. No. 16 (asserting that "Act 41 is *not* a revised or new water quality standard" (emphasis in original) (internal quotation marks omitted)). Under *Chevron*, the court must first determine

whether Congress has "directly spoken" to this issue. In effect, the question is whether the CWA, either in plain text or as constructed, provides a precise definition of the term "water quality standard." If so, the inquiry is at an end and the court must give effect to congressional intent. If not, the court must determine whether the EPA has provided a reasonable answer to this issue, through a definitional provision or otherwise.

In relevant part, the CWA states:

> Whenever the State revises or adopts a new standard, such revised or new standard shall be submitted to the Administrator. Such revised or new water quality standard shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses. Such standards shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation.

33 U.S.C. § 1313(c)(2)(A).

Because the term "water quality standard" is not defined in the statute's definitional provision, 33 U.S.C. § 1362, the court is left to discern the meaning of the term from the above language. The above provision is comprised of four sentences. The first sentence describes a water quality standard as something that can be revised or adopted by a state and submitted to the EPA. It drops no hints as to what that something is. The second sentence is more to the point and describes the standard as consisting of two components: (1) "the designated uses of the navigable waters involved;" and (2) "the water quality criteria for such waters based upon such uses." *Id.* But simply because the standard must consist of two things in no way means that the standard must be exhaustively reduced to those two things. Such an interpretation does not comport with the ordinary meaning of the word "consist." *See Lawson v. FMR LLC*, 134 S. Ct. 1158, 1165 (2014) (stating that "[i]n determining the meaning of a statutory provision, we

look first to its language, giving the words used their ordinary meaning" (internal quotation marks and citation omitted)).

The third sentence is similarly unhelpful because it merely pronounces what the goals of water quality standards are.  The final sentence elucidates specific considerations that should be taken into account when establishing such standards and is, again, not particularly enlightening as to what a water quality standard is.

In sum, while the statutory text describes various features of a water quality standard, too many questions are left unanswered concerning what a water quality standard actually is.  The court, therefore, must presume that Congress implicitly intended those questions to be answered by the EPA, as the administering agency "authorized to prescribe such regulations as are necessary to carry out [its] functions under [the CWA]."  33 U.S.C. § 1361(a); *see City of Albuquerque v. Browner*, 97 F.3d 415, 422 (10th Cir. 1996) (confirming that "[t]he EPA . . . is entitled to considerable deference in its interpretation of the Clean Water Act because it is charged with administering the Act" (citations omitted)).

### 2.    *Chevron* Step Two

Through the promulgation of various regulations, the EPA has supplied clarifying answers regarding the nature of a water quality standard.  Announcing the general purpose of a water quality standard, the EPA states:

> A water quality standard defines the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses. States adopt water quality standards to protect public health or welfare, enhance the quality of water and serve the purposes of the Clean Water Act (the Act). "Serve the purposes of the Act" (as defined in sections 101(a)(2) and 303(c) of the Act) means that water quality standards should, wherever attainable, provide water quality for the protection and propagation of fish, shellfish and wildlife and for recreation in and on the water and take into consideration their use and value of public water supplies,

propagation of fish, shellfish, and wildlife, recreation in and on the water, and agricultural, industrial, and other purposes including navigation.

40 C.F.R. § 131.2.  In an accompanying definitional provision, the EPA further provides a definition of "water quality standards" as follows:

Water quality standards are provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses. Water quality standards are to protect the public health or welfare, enhance the quality of water and serve the purposes of the Act.

40 C.F.R. § 131.3(i).  Finally, the EPA has set forth minimum requirements for water quality standards submissions:

The following elements must be included in each State's water quality standards submitted to EPA for review:

(a) Use designations consistent with the provisions of sections 101(a)(2) and 303(c)(2) of the Act.

(b) Methods used and analyses conducted to support water quality standards revisions.

(c) Water quality criteria sufficient to protect the designated uses.

(d) An antidegradation policy consistent with § 131.12.

(e) Certification by the State Attorney General or other appropriate legal authority within the State that the water quality standards were duly adopted pursuant to State law.

(f) General information which will aid the Agency in determining the adequacy of the scientific basis of the standards which do not include the uses specified in section 101(a)(2) of the Act as well as information on general policies applicable to State standards which may affect their application and implementation.

40 C.F.R. § 131.6.  When viewed against the backdrop of 33 U.S.C. § 1313(c)(2)(A), the statutory provision embodying Congress's most focused discussion of water quality standards, there is no doubt that these regulations reflect the exercise of policy-making discretion "in the interstices created by statutory silence or ambiguity."  *Utility Air Regulatory Grp. v. EPA*, 134 S.

Ct. 2427, 2445 (2014) (citation omitted).  To complete the *Chevron* analysis, and ultimately set up a comparative inquiry between the regulations and Act 41, the court must determine "whether . . . the agency has acted reasonably and thus has stayed within the bounds of its statutory authority." *Id.* at 2439 (internal quotation marks and citation omitted).

Under *Chevron*, this court "may not disturb an agency rule unless it is arbitrary or capricious in substance, or manifestly contrary to the statute." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 53 (2011) (internal quotation marks and citation omitted).  Further, "an agency interpretation that is inconsisten[t] with the design and structure of the statute as a whole . . . does not merit deference." *Utility Air Regulatory Grp.*, 134 S. Ct. at 2442 (internal quotation marks and citation omitted).  Applying these standards, it is apparent that the EPA acted reasonably, that is within the bounds of its statutory authority, in promulgating the above regulations.

On their face, the regulations are neither arbitrary or capricious in substance, nor manifestly contrary to 33 U.S.C. § 1313(c)(2)(A).  *See City of Dover v. United States EPA*, 956 F. Supp. 2d 272, 279 (D.D.C. 2013) (applying 40 C.F.R. § 131.3(i) without questioning whether it was entitled to deference); *Natural Res. Def. Council, Inc. v. Fox*, 909 F. Supp. 153, 161 (S.D.N.Y. 1995) (deferring to EPA regulations interpreting 33 U.S.C. § 1313(c)(2)).  Indeed, 40 C.F.R. § 131.3(i) largely tracks language found in 33 U.S.C. § 1313(c)(2)(A), thereby evidencing an intent on the part of the EPA to hew closely to congressional intent when that intent is clear.[3]

---

[3] Perhaps ironically, there is an argument that, to the extent that the EPA directly imports language from the statute into its regulations, it is not engaging in the type of behavior that warrants deference.  *See Gonzales v. Oregon*, 546 U.S. 243, 257 (2006) (stating that "[a]n agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language").  In this case, it is not at all clear that such an "antiparroting canon" would apply because the cited EPA regulations, in the main, seek to clarify the term "water quality standard," a term that is explicitly left undefined by the text of the CWA.  *See Gonzales*, 546 U.S. at 278 (Scalia, J., dissenting) (employing this phrase and opining that "[a] regulation that significantly clarifies the meaning of an otherwise ambiguous statutory provision is

When viewed in a broader light, the regulations similarly hold up as consistent with "the design and structure" of the CWA as a whole.  If, when design and structure are taken into account, the phrase "water quality standard" "is [revealed to be] a generality, susceptible to more precise definition and open to varying constructions," then surely the above regulations represent a reasonable method of bringing about a more exacting definition.  *Gonzales*, 546 U.S. at 258.

In sum, the CWA allows the EPA to administer the CWA and "to prescribe such regulations as are necessary to carry out [its] functions under [the CWA]."  33 U.S.C. §§ 1251(d), 1361(a).  To the extent that the applicable regulations do not violate clear congressional intent and reflect "a reasonable accommodation of manifestly competing interests,"—here, those interests expressed in 33 U.S.C. § 1251—the overall design and structure of the CWA is best implemented by enforcing those regulations.  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984).

### 3. Does Act 41 constitute a revised or new water quality standard?

Having addressed the *Chevron* analysis, the court must compare the unambiguous text of the EPA regulations to the unambiguous text of Act 41.  *See Talk Am., Inc. v. Michigan Bell Tel. Co.*, 131 S. Ct. 2254, 2260-61 (2011) (observing that another level of analysis comes into play, that of deferring to an agency's interpretation of its own ambiguous regulations, only in the absence of "any unambiguous statute *or regulation*" (emphasis added) (citation omitted)).[4]  As

not a parroting regulation, *regardless* of the sources that the agency draws upon for the clarification" (emphasis in original) (internal quotation marks omitted)).

[4] Even if this case required the court to engage in an analysis of this next layer of deference, so-called *Auer* deference, the court would still find in favor of the EPA.  If the court somehow deemed the applicable EPA regulations to be ambiguous, the EPA's interpretation of those regulations is controlling "unless that interpretation is plainly erroneous or inconsistent with the regulation."  *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013) (internal quotation marks and citation omitted).  The EPA's argument that, far from revising existing water quality standards, Act 41 merely establishes "how the Sewage Facilities Act incorporates antidegradation policy for nonpoint source sewage facilities into that regulatory program" would receive deference as not plainly erroneous or inconsistent with the regulations.  *See* Mem. of Law in Supp. of Mot. to Dismiss Pls.' Compl. at 14; *see also Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (noting that "*Auer* ordinarily calls for

previously stated, the ultimate question in this case, and the one on which jurisdiction hangs, is whether Act 41 constitutes a revised or new water quality standard.  The EPA regulations to which this court defers provide a clear answer to this question—Act 41 does not constitute a revised or new water quality standard.

Act 41 took effect on July 2, 2013, and amended the Sewage Facilities Act.  Compl. at ¶¶ 38-39.  Act 41 revised the Sewage Facilities Act in three ways.  First, Act 41 added the following two definitions to the Act's definitional provision:

> **"Community sewage system"** means any system, whether publicly or privately owned, for the collection of sewage or industrial wastes of a liquid nature from two or more lots, and the treatment and/or disposal of the sewage or industrial waste on one or more of the lots or at any other site.
>
> . . .
>
> **"Individual on-lot sewage system"** means an individual sewage system which uses a system of piping, tanks or other facilities for collecting, treating and disposing of sewage into a soil absorption area or spray field or by retention in a retaining tank.

35 Pa. C.S. § 750.2.  Second, Act 41 amended section 5 of the Act by adding the following paragraph:

> For official plans and official plan revisions for individual on-lot sewage systems and community on-lot sewage systems, the use of such systems when designed and approved in accordance with the requirements of this act and the regulations promulgated under this act satisfies the antidegradation requirements of the act of June 22, 1937 (P.L. 1987, No. 394), known as "The Clean Streams Law," and the regulations promulgated under that act.

35 Pa. C.S. § 750.5(e)(4) (internal footnote omitted).  Finally, Act 41 revised section 7 of the Act by adding the following subsection:

> For permits for individual on-lot sewage systems and community on-lot sewage systems, the use of such systems when designed and approved in accordance with the requirements of this act and the regulations promulgated under this act

---

deference to an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief" (citations omitted)).

> satisfies the antidegradation requirements of the act of June 22, 1937 (P.L. 1987, No. 394), known as "The Clean Streams Law," and the regulations promulgated under that act.

35 Pa. C.S. § 750.7(a.3) (internal footnote omitted).

Clearly, Act 41 is not a "water quality standard," let alone a revised or new one, as that term is defined by the relevant EPA regulations. Most importantly, Act 41 does not consist of "a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses." 40 C.F.R. § 131.3(i). Nor does Act 41 even remotely approximate anything like the federally-promulgated water quality standards, codified at 40 C.F.R. §§ 131.31-131.44. The very definition of a "water quality standard," tailored as it is to designating uses for a particular water body, 40 C.F.R. § 131.2, does not fit comfortably within the framework of the Sewage Facilities Act. *See generally*, 35 Pa. C.S. § 750.3 (stating declaration of policy). Indeed, without engaging in some form of super-construction of Act 41 and the relevant EPA regulations (and even then, it would be questionable), it is quite difficult to comprehend how Act 41, as a provision of state law not meeting any of the requirements spelled out in the regulations, could be viewed as a water quality standard.

In the face of this difficulty, the plaintiffs offer some suggestions. They first put forth the following logic:

> Act 41 prohibits the use of antidegradation in analyzing and regulating whether on-lot sewage systems may pollute streams. The emphasis is on the activity and not on the source of discharge. Since antidegradation is a water quality standard, and since Act 41 prohibits the use of that water quality standard, and since that water quality standard only applies to streams, then EPA must deny Act 41 pursuant to its requirements under the Clean Water Act.

Pls.' Resp. Mem. of Law to EPA's Cross Mot. for Summ. J. at 2, Doc. No. 39. On its own terms, the logic is fair enough. But antidegradation is not a water quality standard and Act 41, therefore, does not prohibit the use of such a standard. Rather, an antidegradation policy is akin

to an *element* of a water quality standard. 40 C.F.R. § 131.6(d); *see Kentucky Waterways Alliance v. Johnson*, 540 F.3d 466, 471 (6th Cir. 2008) (stating that "[p]ursuant to a 1987 amendment to the CWA . . . state-established water quality standards must include an antidegradation policy" (citation omitted)).

The plaintiffs next principally rely on two out-of-circuit cases for the proposition that the EPA has a mandatory duty to review laws that, while not themselves water quality standards, can impact water quality standards.[5] *See* Pls.' Resp. to Mot. to Dismiss at 12-14. The first is *Northwest Environmental Advocates v. United States EPA*, 855 F. Supp. 2d 1199 (D. Or. 2012), which announces that "[j]ust as the CWA demands that the EPA review new or revised water quality standards, it must also require a review of new or revised regulations that affect whether and how those standards are applied." *Id.* at 1211. The second is *Florida Public Interest Research Group Citizen Lobby, Inc. v. EPA*, 386 F.3d 1070 (11th Cir. 2004), which holds:

> Ultimately, whether the district court had jurisdiction to hear the plaintiffs' suit depends on whether the Impaired Waters Rule had the effect of revising or adding to Florida's Surface Water Quality Standards. In answering that question in the negative, the district court did not fully examine the practical impact the Impaired Waters Rule may have had on the state's existing water quality standards—an examination necessary to the proper resolution of the jurisdictional question.

*Id.* at 1091. In advocating for the adoption of their position, the plaintiffs were surely right to cite to these cases. The cited language indeed appears to be more favorable to the plaintiffs than the text of the CWA itself. But therein lies the problem. The plain text of the CWA does not support it. By its terms, the CWA only compels the EPA to review "revised or new water quality standard[s]." 33 U.S.C. § 1313(c). And while the term "water quality standard" as it appears in the CWA might be ambiguous, the language creating the EPA's duty to review revised or new water quality standards is not. That language simply does not require review of something that

---

[5] Accepting this characterization of the EPA's duty to act may influence whether a court construes the jurisdictional challenge as a facial or factual attack.

has an impact on those standards.  "It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."  *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) (internal quotation marks and citations omitted).

If, however, there were any doubts as to precisely what type of water quality standards the EPA should be reviewing, bedrock principles of administrative law mandate that those doubts be resolved, to the extent reasonable, by the EPA, not by the courts.  The Eleventh Circuit decision cited above, and on which the other cited case relies, is devoid of any mention of deference, *Chevron* or otherwise, when confronting this issue.

On a final note, in their briefing, the Intervenors argue that the plaintiffs' position raises serious constitutional questions, involving both principles of separation of powers and federalism.  *See* Mem. of Law in Supp. of Intervenors The Nat'l Ass'n of Homebuilders' and Pennsylvania Builders Ass'n's Mot. for Summ. J. at 8-15, Doc. No. 35.  While the court appreciates the insight, the disposition of this matter does not present occasion to pass upon such fundamental issues of governmental structure.  *See Pearson v. Callahan*, 555 U.S. 223, 241 (2009) (noting a "general rule of constitutional avoidance" (citations omitted)).

### D.      The APA Claim

The plaintiffs also bring a claim under the APA.  "Although the APA does not directly grant jurisdiction, the federal question statute, 28 U.S.C. § 1331, confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."  *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 494 (6th Cir. 2014) (internal quotation marks and citations omitted).  Unlike the CWA claim, the court addresses the APA claim on the merits.  Like the CWA claim, this claim must be dismissed as well.

In relevant part, the APA provides that "[a]gency action made reviewable by statute and final agency action *for which there is no other adequate remedy in a court* are subject to judicial review." 5 U.S.C. § 704 (emphasis added). "[A]lthough the primary thrust of § 704 was to codify the exhaustion requirement, the provision as enacted also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Because, as revealed in the complaint, the APA claim duplicates the CWA claim, review is not available under the APA. *See* Compl. at Counts 3-5; *see also Hayes v. Whitman*, 264 F.3d 1017, 1025 (10th Cir. 2001) (holding that "[b]ecause review of Plaintiffs' claim *is* available under the Clean Water Act, it is not subject to review under the APA" (emphasis in original) (citations omitted)); *Basel Action Network v. Maritime Admin.*, 370 F. Supp. 2d 57, 76 (D.D.C. 2005) (holding that "judicial review under the APA is precluded when a remedy is available under a citizen suit provision of an environmental statute" (citations omitted)).

The APA claim also fails as a matter of law for an independent reason. To the extent that the plaintiffs seek to compel agency action, "the only agency action that can be compelled under the APA is action legally *required*." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004) (emphasis in original). As previously discussed, the EPA does not have a mandatory duty to review Act 41.

### III.   CONCLUSION

When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges—who have no constituency— have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: Our Constitution vests such responsibilities in the political branches.

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 866 (1984) (internal quotation marks and citation omitted).  Whether Act 41 constitutes a revised or new water quality standard is a question best addressed by the EPA; the court's role is merely to ensure that the EPA acts within its statutory authority when it renders its answer.  That answer, that Act 41 does not constitute a water quality standard, is a reasonable one and the court ultimately and properly implements congressional intent by enforcing it as such.

For these reasons, and for the other above-stated reasons, the court grants the EPA's motion to dismiss and dismisses the CWA claim on jurisdictional grounds and the APA claim on the merits.  All outstanding motions for summary judgment are denied as moot.

An appropriate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.

21