IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE PINE CREEK VALLEY WATERSHED ASSOC., RAYMOND PROFFITT FOUNDATION, THE DELAWARE RIVERKEEPER NETWORK, and THE DELAWARE RIVERKEEPER C/O JOHN WILMER, ESQ., | : : : : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 14-1478 |
| v. | : : | |
| THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, GINA MCCARTHY, Administrator, and SHAWN GAVIN, Region III Administrator, | : : : : : : : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Smith, J.                                                                                                  September 28, 2015

The court initially disposed of this action, an administrative law case primarily presenting a question of statutory construction and agency deference, on March 17, 2015, by dismissing the plaintiffs' two-claim complaint in response to a motion to dismiss filed by the defendants. The plaintiffs (divided into two groups in this postjudgment phase) subsequently filed motions for reconsideration raising jurisdictional, procedural, and substantive issues with this prior ruling. The most serious, and interesting, issue raised by the plaintiffs revolves around the court's previous interpretation of the phrase "revised or new water quality standard" within the meaning of the Clean Water Act ("CWA"), 33 U.S.C. § 1313(c)(2)(A). As explained below, and due to the wording of the CWA citizen-suit provision, the interpretation of this phrase ended up playing a crucial role in the jurisdictional dismissal of the plaintiffs' primary claim.

That phrase took on jurisdictional significance in the following way. The citizen-suit provision confers subject-matter jurisdiction on the court to compel the EPA to act only when the EPA fails to perform a mandatory duty. The CWA, in turn, can be read to impose a non-discretionary duty on the EPA to review any revised or new water quality standard. Because the plaintiffs were asking the court to compel the EPA to, at a minimum, review Act 41, a Pennsylvania statute dealing with on-lot sewage systems, for compliance with the CWA, the dispositive inquiry became whether Act 41 is a revised or new water quality standard within the meaning of the CWA.

The court ultimately decided (or, more accurately, decided to let the EPA decide) this question in the negative. Two fundamental premises guided the court in coming to this conclusion. First, the court presumed that something could not be a revised or new water quality standard without meeting the threshold definition, whatever that might be, for what a water quality standard is. Second, the court situated the interpretive exercise of giving meaning to the term "water quality standard" within the familiar *Chevron* framework. Deference to the EPA, then, took on a central role in trying to figure out what it means to be a revised water quality standard.

The plaintiffs' instant motions for reconsideration require the court to reexamine these premises. Given the textual and structural complexity attending both the CWA and the implementing regulations, there is indeed another perspective from which to view this case. The bulk of this memorandum opinion, then, is devoted to a discussion of that angle. Unfortunately for the plaintiffs, however, this alternative analysis, standing alone, does not warrant a disturbance of the court's prior disposition. The other grounds for reconsideration advanced by

the plaintiffs, while less powerful than the interpretive issue, do not warrant any disturbance either. The court, therefore, denies the instant motions for reconsideration.

## I. PROCEDURAL HISTORY

The court previously documented the procedural history leading to the entry of the underlying judgment in the March 17, 2015 memorandum opinion. Mem. Op. at 2-4, Doc. No. 43. As there is no need to recount that history here, the court focuses solely on the immediate events culminating in this memorandum opinion. They can be briefly summarized.

After the court issued both the March 17, 2015 order dismissing the plaintiffs' complaint and an accompanying memorandum opinion, all of the named plaintiffs collectively filed a motion for reconsideration on March 25, 2015. *See* Pls.' Mot. for Recons. of the Ct.'s Mem. Op. of Mar. 17, 2015, Doc. No. 45. On that same day, the plaintiffs, the Pine Creek Valley Watershed Assoc. and Raymond Proffitt Foundation ("Pine Creek Plaintiffs"), filed a corrected motion for reconsideration. *See* Corrected Pls.' Pine Creek Valley Watershed Assoc. and Raymond Proffitt Found.'s Mot. for Recons. of the Ct.'s Mem. Op. of Mar. 17, 2015, Doc. No. 46.[1] The other group of plaintiffs, the Delaware Riverkeeper Network and the Delaware Riverkeeper ("DRN Plaintiffs"), followed up with a motion for reconsideration of their own on April 13, 2015. *See* Pls. Del. Riverkeeper Network and the Del. Riverkeeper's Mot. for Recons. of the Ct.'s Mem. Op. of Mar. 17, 2015, Doc. No. 50.

Shortly thereafter, both the defendants and the intervenors filed separate responses to the motions. *See* Defs.' Resp. to Pls.' Mots. for Recons. of the Ct.'s Mar. 17, 2015 Mem. Op. ("Defs.' Resp."), Doc. No. 51; Intervenors The Nat. Assoc. of Homebuilders' and Pa. Builders Assoc.'s Resp. to Pls.' Mots. for Recons. of the Ct.'s Mem. Op. of Mar. 17, 2015, Doc. No. 52.

---

[1] It appears that the Pine Creek Plaintiffs filed an amended motion for the sole purpose of clarifying that the initial motion was supposed to be filed on their behalf only, and not on behalf of all named plaintiffs.

Each group of plaintiffs filed a reply brief in support of their respective motions on May 8, 2015. *See* Reply Mem. of Law in Supp. of Pls.' Pine Creek Valley Watershed Assoc. and Raymond Proffitt Found.'s Mot. for Recons. of the Ct.'s Mem. Op. of Mar. 17, 2015 ("Pine Creek Pls.' Reply"), Doc. No. 53; Reply Mem. of Law in Supp. of Pls. Del. Riverkeeper Network and the Del. Riverkeeper's Mot. for Recons. of the Ct.'s Mem. Op. of Mar. 17, 2015, Doc. No. 54. The court held oral argument on the motions on May 27, 2015.

## II.     DISCUSSION

### A.     Standard of Review

As the operative motions for reconsideration are grounded in Federal Rule of Civil Procedure 59(e), the court recites the applicable standard of review. *See* Corrected Mem. of Law in Supp. of Pls.' Pine Creek Valley Watershed Assoc. and Raymond Proffitt Found.'s Mot. for Recons. of the Ct.'s Mem. Op. of Mar. 17, 2015 ("Pine Creek Pls.' Mot.") at 2; Mem. of Law in Supp. of Pls. Del. Riverkeeper Network and the Del. Riverkeeper's Mot. for Recons. of the Ct.'s Mem. Op. of Mar. 17, 2015 ("DRN Pls.' Mot.") at 2, Doc. No. 50.

Federal Rule of Civil Procedure 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). "The purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or to present newly discovered evidence." *U.S. ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 848 (3d Cir. 2014) (internal quotation marks and citation omitted). "A proper Rule 59(e) motion therefore must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (citation omitted).

Both sets of plaintiffs contend that the court committed various clear errors of law in granting the defendants' motion to dismiss. Only one of these contentions, namely the court's prior interpretation of the CWA, necessitates sustained discussion. The court first turns to that issue.

### B.      Statutory Interpretation and Agency Deference

In the March 17, 2015 memorandum opinion, the court began by recognizing that the dispositive issue of "whether Act 41 constitutes a revised or new water quality standard" turns on principles of "statutory construction and agency deference." Mem. Op. at 7, 10. The court, therefore, turned to the *Chevron* framework as the primary lens through which to view this interpretive issue. *See id.* at 7. In applying the first step of the *Chevron* analysis, the court initially confronted the question whether Congress has "directly spoken," through the text and structure of the CWA, to the precise issue of whether Act 41 constitutes a revised or new water quality standard. *See id.* at 10-11. After concluding that Congress has not so spoken, the court engaged the second step of the *Chevron* analysis, which required the court to consult the implementing regulations promulgated by the EPA. *See id.* at 12-15. Finding the regulations supplying "clarifying answers regarding the nature of a water quality standard" to be reasonable, the court ultimately held that those regulations unambiguously preclude the conclusion that Act 41 constitutes a revised or new water quality standard. *Id.* at 12; *see id.* at 2, 15-19. As previously noted, this rendered the CWA claim jurisdictionally defective. *See id.* at 8-10.

Implicit in the above analysis, and made explicit at times in the March 17, 2015 memorandum opinion, is the idea that the definition of a water quality standard is subsumed within the definition of a "revised or new water quality standard," as this term appears in the CWA. 33 U.S.C. § 1313(c)(2)(A). In the prior memorandum opinion, the court grappled with

that implication at the level of interpreting the CWA.  That is, because the CWA imposes a mandatory duty on the EPA to review a "revised or new water quality standard" (sometimes simply phrased as a "revised or new standard"), and not something like "revisions to water quality standards," the court presumed that the terms "revised" and "new" simply modify the term "water quality standard," and, as a result, that any definition of the term "revised or new water quality standard" must, at a bare minimum, build upon the base definition of "water quality standard."  *Id.*  This premise explains why the court was concerned with EPA regulations supplying "clarifying answers regarding the nature of a *water quality standard*" and not regulations bringing about a more specific definition of the unitary term "revised or new water quality standard"—for as this memorandum opinion later explains, there are no such regulations.  Mem. Op. at 12 (emphasis added).  The court simply presumed that the CWA is clear that revised water quality standards are fundamentally of the same nature as initial water quality standards.

By negative implication, the court also presumed that the only ambiguity accompanying the phrase "revised or new water quality standard" is the constituent phrase "water quality standard."  That is why the court deferred to the EPA regulations solely on that issue.  *See id.* at 12-15.  And while the parties did not initially address any purported distinction between the content of originally-enacted water quality standards and the content of modified water quality standards (or, the content of a "water quality standard" as opposed to the content of a "revised or new water quality standard"), other courts have observed that there may be a rather unique relationship between the two.  *See City of Dover v. United States EPA*, 956 F. Supp. 2d 272, 279 (D.D.C. 2013) (opining that a certain document could not be a "revised water quality standard" because "it is not a water quality standard at all"); *Natural Res. Def. Council, Inc. v. Fox*, 909 F.

Supp. 153, 161 (S.D.N.Y. 1995) (discussing this distinction in disposing of a claim under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706).

Both sets of plaintiffs, through their respective motions for reconsideration, now suggest (albeit implicitly) that this distinction is of prime importance in understanding the relationship between the CWA, the implementing regulations, and Act 41. To be sure, all of the plaintiffs maintain that the court erred in stating that because antidegradation is only an element of a water quality standard, the EPA need review revised antidegradation policies only when the text of the CWA so demands, that is when they are a part of something that falls within the definition of the phrase "revised or new water quality standard." *See* Pine Creek Pls.' Mot. at 2; DRN Pls.' Mot. at 2-5. Instead, the plaintiffs effectively argue that the EPA has a mandatory duty to review modified elements of a water quality standard even when those elements are not packaged with the other legally-required elements of such a standard. *See* Pine Creek Pls.' Mot. at 2 (stating that viewing a revised water quality standard against the backdrop of its revised constituent elements is a "distinction without a difference"); DRN Pls.' Mot. at 3 (stating, interestingly enough given the court's prior discussion, that "any revisions *to* an antidegradation policy must be submitted and reviewed"). This reading of the CWA is far from obvious and all the more unclear given the fact that the court in *Fox* actually deferred to the EPA on this very question, thus implying that the relevant legal texts are not particularly lucid on this point. *See Fox*, 909 F. Supp. at 161 (deferring to the EPA's interpretation of its own regulations in considering whether the EPA's review of certain revisions to water quality standards was deficient because the revisions omitted an antidegradation policy). But, given some of the arguments made by the defendants, the court is inclined to engage the plaintiffs on their own terms and determine

7

whether a potential distinction between the content of initial and revised standards is a distinction with a difference, in the sense of being case-dispositive.

This type of analysis is especially appropriate because it seems that the defendants themselves agree with the plaintiffs in understanding the content of initial standards as differing from the content of revised standards. Deviating from the plaintiffs only slightly, the defendants state the following: "[t]o be clear, EPA does not dispute that it must review all components of a state's revised or new water quality standards, including a revised or new antidegradation policy, for consistency with the [CWA]." Defs.' Resp. at 5. Because the court does not dispute this proposition either, it serves as a useful starting point in structuring the proposed, alternative analysis.

The court begins with a position that appears to be uncontroversial: when something constitutes a revised or new water quality standard within the meaning of the CWA, the EPA has a mandatory duty to review it. *See* Mem. Op. at 10. And that review requires, in line with the defendants' argument, that the EPA review the content of that standard as that content is defined by law. But whereas the court previously concluded that that content tracks the content of an initial water quality standard—and therefore deferred to the EPA solely on the question of what a water quality standard actually is—the court must now interpret "revised or new water quality standard" as a unitary phrase and examine whether this interpretive change alters the dynamic of deference. As it turns out, the deference inquiry does change, but not in a way that warrants a disturbance of the court's previous disposition.

In line with the court's prior discussion of *Chevron*, the first question remains the same and asks whether Congress, through the text of the CWA, has "directly spoken" to what a "revised or new water quality standard" is. *See City of Arlington, Texas v. FCC*, 133 S. Ct. 1863,

1868 (2013) (internal quotation marks and citation omitted).  If the court previously found that the CWA does not clearly and precisely address the issue of what a water quality standard is, it would seem that the court is almost compelled to likewise conclude that the CWA does not clearly and precisely address what a "revised or new water quality standard" (understood as a unitary phrase) is seeing as how the addition of the terms "revised" and "new" serve only to inject another layer of ambiguity into the picture.  *See American Farm Bureau Fed'n v. EPA*, 792 F.3d 281, 306 (3d Cir. 2015) (holding that the phrase "total maximum daily load," a term not defined in the CWA, is ambiguous at the first step of the *Chevron* analysis).  Of particular note, the DRN Plaintiffs agree that "Congress has not directly addressed the precise question at issue in this litigation."[2]  DRN Pls.' Mot. at 8.  Just as before, the court, "therefore, must presume that Congress implicitly intended [that] question to be answered by the EPA."  Mem. Op. at 12.

The next inquiry, then, is determining whether the EPA has provided an unambiguous answer to this question through the promulgation of particular regulations.  This is a critical step because it determines, in turn, whether the court has to engage another layer of deference.  *See Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 557 U.S. 261, 277-78 (2009) (noting, in the context of a CWA case, that when the statutory text alone does not dispose of a case, courts must "look first to the agency regulations, which are entitled to deference if they resolve the ambiguity in a reasonable manner" and must look to "agencies' subsequent interpretation of those regulations" only when the regulations are themselves ambiguous (citations omitted)).  In the prior memorandum opinion, the court decided both that the EPA regulations unambiguously define the term "water quality standard" and that Act 41 does not fall within that definition.  *See* Mem. Op. at 15-17.  Due to the current reframing of the operative

---

[2] Consequently, and making reference to arguments previously advanced by the intervenors, the court need not "consider *Chevron*'s interaction with two canons of statutory construction—constitutional avoidance and the related federalism canon."  *American Farm Bureau*, 792 F.3d at 301 (internal quotation marks and citation omitted).

inquiry, however, the court must now investigate whether the EPA has similarly provided an unambiguous answer when the phrase "revised or new water quality standard" is taken as a singular whole.

As with before, the text and structure of the relevant legal texts chart the way. Beginning with the text, the definitional provision in the EPA regulations defines a water quality standard, but it does not define what a revised or new water quality standard is. *See* 40 C.F.R. § 131.3. In fact, the regulations reference water quality standards using a variety of phraseologies. Of course, and as just mentioned, the regulations mention water quality standards. But they also reference "revising water quality standards," a "new or revised standard," "water quality standards revisions," "existing water quality standards," "applicable water quality standards," "proposed water quality standards revision," and "any revisions of the standards." 40 C.F.R. §§ 131.4(a), 131.5(b), 131.6(b), 131.10(i), 131.20(a)-(c). If there is a true distinction between the content of initial water quality standards and the content of revised ones, it is extraordinarily difficult to pinpoint from the face of the regulations just what that distinction might be. Not only do the regulations speak both of a "new or revised standard" and of "any revisions of the standards," but they offer no guidance as to whether this rhetorical distinction even matters and, if it does matter, how it matters when viewed against the base definition of what a water quality standard is. Even when the text of the regulations is consulted, the following question still lingers: is the EPA to review revised standards only when those standards come packaged as full-on water quality standards (regardless of whether the states submit them to the EPA) or is the EPA to review any revision to those standards, no matter what form it takes?

Unfortunately, the structure of the regulations, even when combined with the text, does not provide much clarity in this regard either. The water quality standard regulations start out

with Subpart A, entitled "General Provisions." It is in this Subpart that the regulations provide a definition of a water quality standard. *See* 40 C.F.R. § 131.3(i). It is also in this Subpart that the regulations spell out the breadth of EPA review of water quality standards, which includes determining "[w]hether the State has adopted water uses which are consistent with the requirements of the Clean Water Act" and "[w]hether the State has adopted criteria that protect the designated water uses," among others. 40 C.F.R. §§ 131.5(a)(1)-(2). Finally, this Subpart explains the elements of a water quality standard that must be present for EPA review. *See* 40 C.F.R. § 131.6.[3]

The following Subpart, namely Subpart B, is entitled "Establishment of Water Quality Standards" and contains provisions that, in general, elaborate upon the elements of a water quality standard appearing in Subpart A. *See* 40 C.F.R. §§ 131.10-131.13. Subpart C, entitled "Procedures for Review and Revision of Water Quality Standards," appears to encompass the provisions most specific to understanding just what a revised or new water quality standard is. Indeed, it is within the confines of one of this Subpart's provisions that a direct answer *appears* to lie. 40 C.F.R. § 131.20(c), a provision called "State Review and Revision of Water Quality Standards," provides that a state shall submit "any revisions of the standards to the Regional Administrator for review and approval." 40 C.F.R. § 131.20(c). At first blush, this provision would seem to suggest that a revised or new water quality standard is not a totally-packaged water quality standard in altered form, but merely a revision to a water quality standard (in whatever form that may take). But this provision cannot be read in isolation. *See Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014) (stating that "words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (internal quotation marks and citation omitted)).

---

[3] The court has previously quoted this provision at length. *See* Mem. Op. at 13.

When read in juxtaposition to Subpart A, it seems reasonable to suggest that a tension emerges.  On the one hand, the "General Provisions" section, a section that purports to embrace both initial and revised standards, promulgates very specific requirements for the submission of water quality standards to the EPA.  *See* 40 C.F.R. § 131.6.  On the other hand, the more specific section dealing with review and revision of water quality standards contains a provision addressing the submission of revisions that seemingly does not require a state to follow the dictates of 40 C.F.R. § 131.6.  *See* 40 C.F.R. § 131.20(c).  What is more, this tension is arguably complicated by the fact that there is a section dealing specifically with the establishment of water quality standards that omits any reference to the requirements of water quality standards submissions.

What all of this means, then, is that once the text and structure of the EPA regulations are taken into account, it is extremely difficult to conclude that the regulations unambiguously address the content making up a revised or new water quality standard.  Whether something can be a revised or new water quality standard without itself being a water quality standard is still unsettled.  So the court must turn to the EPA's "subsequent interpretation of those regulations." *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 557 U.S. 261, 278 (2009) (citations omitted).  This involves the doctrine known as *Auer* deference.  *See Auer v. Robbins*, 519 U.S. 452 (1997).

Before getting into the merits of *Auer* deference in this case, two threshold issues bear mentioning.  First, the court mentioned *Auer* in footnote four of the March 17, 2015 memorandum opinion as a doctrine that may need to be addressed should the applicable EPA regulations prove to be ambiguous.  *See* Mem. Op. at 15 n.4.  Second, in their response to the plaintiffs' motions for reconsideration, the defendants are reluctant to invoke *Auer* deference

because they apparently think that a reference to this doctrine raises the possibility that the court deferred to EPA's interpretation of state, as opposed to federal, law. *See* Defs.' Resp. at 8-10. The court takes this opportunity to explain footnote four in more detail while at the same time disclaiming any intention whatsoever to give deference to a federal agency's interpretation of state law.

In general, *Auer* deference mandates that courts defer to an agency's interpretation of its own regulations "even in a legal brief, unless the interpretation is plainly erroneous or inconsistent with the regulation[s] or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Talk Am., Inc. v. Michigan Bell Tel. Co.*, 131 S. Ct. 2254, 2261 (2011) (internal quotation marks and citation omitted). In this case, the defendants have continuously argued that Act 41 is not a revised or new water quality standard "because Act 41 did not establish or revise Pennsylvania's antidegradation policy or any other component of Pennsylvania's water quality standards." Defs.' Resp. at 5. Specifically, the defendants have maintained throughout this litigation that, rather than altering Pennsylvania's antidegradation policy, Act 41 simply "specifies how on-lot sewage systems may comply with" that policy. *Id.* at 6. The way to begin to reconcile the idea of giving *Auer* deference to the EPA without deferring to the EPA's interpretation of Act 41 is to view the defendants' position as *an interpretation of its own regulations*.

In other words, there is no reason not to think that when the defendants argue that Act 41 did not alter Pennsylvania's antidegradation policy, they are actually giving meaning to the various phraseologies used to describe revised water quality standards as those phraseologies appear in the applicable *federal* regulations. Consider *Auer* itself. In that case, the Court considered regulations promulgated by the Secretary of Labor that implement a "salary-basis"

13

test for determining whether an employee is exempt from overtime pay requirements. *See Auer v. Robbins*, 519 U.S. 452, 454 (1997). After sustaining the Secretary's application of that test to public employees under *Chevron*, the Court stated the following:

> A primary issue in the litigation unleashed by application of the salary-basis test to public-sector employees has been whether, under that test, an employee's pay is "subject to" disciplinary or other deductions whenever there exists a theoretical possibility of such deductions, or rather only when there is something more to suggest that the employee is actually vulnerable to having his pay reduced.

*Id.* at 459. The Court then deferred to the Secretary's interpretation of the salary-basis test "to deny exempt status when employees are covered by a policy that permits disciplinary or other deductions in pay as a practical matter," a standard that is met "if there is either an actual practice of making such deductions or an employment policy that creates a significant likelihood of such deductions." *Id.* at 461 (internal quotation marks omitted). Of vital importance here, the Court concluded that the phrase "subject to," a phrase appearing in the text of the regulations, "comfortably bears the meaning the Secretary assigns." *Id.* at 461 (citations omitted).

Getting back to the case at hand, if the Secretary of Labor can interpret the regulatory phrase "subject to" in the way just described, it is difficult to understand why the EPA cannot interpret the various references to revised water quality standards in its regulations to come to the conclusion that Act 41 is not a revised or new water quality standard. *See City of Dover v. United States EPA*, 956 F. Supp. 2d 272, 279 n.1 (D.D.C. 2013) (observing that even if 40 C.F.R. § 131.3(i) is ambiguous, the EPA would have received *Auer* deference on the question whether a certain document constituted a revised water quality standard). To be sure, by maintaining that Act 41 is not such a standard because it does not revise Pennsylvania's antidegradation policy, the EPA appears to be interpreting its regulations to mean that something cannot be a revised standard unless it *directly* amends a component of an existing standard through the proper

procedural channels. *See* Defs.' Resp. at 5-6 (noting that Act 41 revises the Sewage Facilities Act and not the Clean Streams Law or its implementing regulations); *see also* 40 C.F.R. § 131.3(i) (stating that "[w]ater quality standards are provisions of State or Federal law"). This is an interesting interpretation because it sits in the middle of the court's reframing of the central ambiguity underlying the regulatory definition of a revised or new water quality standard.

Recall, that ambiguity primarily presents the question whether the EPA must review revised standards only when those standards meet the base definition of a water quality standard or whether the EPA has a duty to review revisions to the standards' component parts, even when those parts are not packaged in a way to meet the definition of a water quality standard. The EPA's position pretty clearly dispenses with the idea that something must actually be a water quality standard to trigger EPA review. But its position also does not comfortably square with the idea that the EPA has a duty to review any revision to an existing water quality standard, unguided by a limiting principle. Rather, the EPA appears to argue that something triggers review as a revised standard only when it directly alters a constituent element of an existing standard through proper procedural channels.

The test under *Auer*, however, is not whether the EPA's proposed solution resolves interpretive ambiguities in the most satisfactory way possible. Indeed, neither the text nor the structure of the applicable regulations compels the EPA's position. Rather, the test is whether the EPA has acted reasonably in the face of interpretive ambiguities, even if those ambiguities are of the agency's own making. The answer here is that the EPA has acted reasonably because its proposed interpretation is "neither plainly erroneous or inconsistent with the [applicable] regulation[s]" and the parties have not offered any reason to suspect that it does not reflect the EPA's fair and considered judgment on the issue in question. Quite the contrary, should the EPA

apply this reasoning outside of this case, it may have the potential to bring more stability to the underlying statutory and regulatory schemes.

Accordingly, the court treats the EPA's position on Act 41 as a permissible interpretation of its own regulations. Instead of receiving *Chevron* deference, the EPA would now receive *Auer* deference. The court's prior disposition of the CWA claim remains unchanged.

### C. Remaining Grounds for Reconsideration

With the court's reexamination of the main interpretive issue in hand, the court can address both sets of plaintiffs' remaining grounds for reconsideration in sequential fashion. The court begins with the remaining arguments advanced by the Pine Creek Plaintiffs. In addition to arguments addressed in the preceding discussion, these plaintiffs take issue with the court having disposed of their CWA claim at the motion to dismiss stage. *See* Pine Creek Pls.' Mot. at 4. They argue that the court was required to accept the following statement as a well-pleaded factual allegation: "Act 41 deals solely with antidegradation and prohibits antidegradation review under the Sewage Facilities Act." *Id.* at 4. This statement, however, is a legal conclusion and the court, therefore, was not required to accept it as true. *See Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (observing that a facial attack under Federal Rule of Civil Procedure 12(b)(1) "calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under [Federal] Rule [of Civil Procedure] 12(b)(6)" (citation omitted)). They also argue that the court should not have dismissed the CWA claim on a facial challenge to jurisdiction because the claim presents a nonfrivolous federal question. *See* Pine Creek Pls.' Reply at 1-4. Although this argument may be correct in the general run of federal question cases, it overlooks the critical fact that "[a] clearly mandated, nondiscretionary duty imposed on the Administrator is a *prerequisite for federal jurisdiction* under the CWA

citizen suit provision." Mem. Op. at 8 (emphasis added).  As a final argument, these plaintiffs contend that the court improperly dismissed the APA claim given the alleged errors in the court's analysis of the CWA claim.  *See* Pine Creek Pls.' Mot. at 5.  No matter how the CWA claim is disposed of, the court did not err in dismissing the APA claim for the reasons previously stated in the March 17, 2015 memorandum opinion.  *See* Mem. Op. at 19-20.  The APA claim does not sit as an alternative to the CWA claim; the CWA claim displaces the APA claim.

With respect to the DRN Plaintiffs, the only argument left to be considered is the argument that the CWA requires the EPA to review not just something that falls within the literal definition of a revised or new water quality standard, but also something that has the potential to impact existing water quality standards.  DRN Pls.' Mot. at 5-7.  Not only has the court already addressed this argument in the prior memorandum opinion, but the court has now provided an additional reason for its rejection in this memorandum opinion.  Suffice it to say, this line of reasoning does not warrant a disturbance of the court's prior ruling.

## III.   CONCLUSION

The crux of the main interpretive issue in this case centers on attempting to give meaning to a less-than-clear phrase in a "less-than-clear statute."  *American Farm Bureau Fed'n v. EPA*, 792 F.3d 281, 309 (3d Cir. 2015) (characterizing the CWA in this manner).  The bottom line in administrative law cases, at least for now, is that the exercise of resolving interpretive ambiguities in less-than-clear legal texts, whether the text is a statute or a regulation, is reserved to the administering agency to the extent that it acts reasonably.  Although this case can be viewed under multiple lenses, the important point is not to get too bogged down in determining whether ambiguity rests solely within the CWA or within the implementing regulations as well.  The important point is that Congress created an ambiguity in the first place.  For in this area of

law, it is this type of ambiguity that allows an agency to bring its expertise to bear on a precise issue.  *See id.* at 298 (noting that textual ambiguity in a statute is a signal that "Congress wanted an expert to give meaning to the words it chose").  The court's role in this order is both to ensure that the agency does not stray beyond the scope of the delegated power allowing it to exercise its expertise and to ensure that the agency does not stray beyond norms of consistency and reason when it actually acts on that expertise.

Here, the EPA has acted within the scope of ambiguity that the CWA contains.  And, depending on how the interpretive inquiry is framed, it has also acted within the scope of ambiguity that the implementing regulations contain, if there even is any ambiguity to be had.  The court, therefore, did not err in finding in favor of the EPA.  Both sets of plaintiffs' motions for reconsideration are denied.

The court will issue a separate order.

                                          BY THE COURT:

                                          /s/ *Edward G. Smith*
                                          EDWARD G. SMITH, J.